## EMBRY v. LEWIS. (No. 7352.)

Court of Civil Appeals of Texas. Austin.
May 29, 1929.

Turner, Rodgers & Winn, of Dallas, for appellant.

Chas. Romick, of Dallas, for appellee.

McCLENDON, C. J. This is a suit for damages arising out of a sale of appellee's home to appellant, and failure of the latter to deliver to the former four $100 par value shares of the capital stock of the First State Bank of Abilene. The petition upon which appellee, plaintiff below, went to trial set up two counts—one ex delicto, based upon allegations of fraud; and the other ex contractu. As to the former, limitation under the two years' statute was pleaded, and we will assume was established as a matter of law. We will therefore consider the case only as one for breach of contract. The judgment was for plaintiff upon a directed verdict. The defendant has appealed.

The case arose out of the following facts, which we will treat as uncontradicted, since the defendant offered no testimony:

May 1, 1924, plaintiff and defendant entered into a written contract by which plaintiff agreed to convey to defendant the property in question, which was the homestead of plaintiff and wife, for $2,900; of which $1,500 was to be in cash and $1,400 in assumed incumbrance. The contract provided: "The sum of $400.00 of the above mentioned cash payment is to be represented by the transfer to the said seller of four shares of stock in the First State Bank of Abilene, in Abilene, Texas."

On Saturday, May 3, 1924, plaintiff and wife executed and delivered to defendant a deed to the property, and defendant paid the cash consideration, except the $400, explaining that the stock was in one certificate covering five shares, and it would be necessary for him to have the four shares separated and transferred to plaintiff, which he agreed to do; and, as evidence of this agreement, he signed and delivered to plaintiff the following stipulations: "This is to certify that I hold for Mr. H. H. Lewis four shares of the stock of the First State Bank of Abilene, Texas, and same is represented in a larger certificate for five shares of said stock, and I agree to get said four shares of stock transferred into the name of H. H. Lewis and deliver same to him, or mail under registered cover to the address which he may give to me for that purpose within a reasonable time, probably within thirty days."

On Monday morning, May 5, 1924, Penry, who acted as agent of one of the parties, telephoned plaintiff that defendant had left in his office an envelop for plaintiff, and asked that he come and get it. This he did that afternoon. The envelop contained two certificates, each for two shares, which were in the name of defendant, and were dated April 3, 1924. These certificates were indorsed in blank by defendant. Plaintiff was then leaving Dallas for Sherman, and took the certificates with him, and some time later mailed them to the bank, with the request that they be transferred to him on its books. They were returned to plaintiff with a letter, dated May 23, 1924, signed by the cashier of the First State Bank of Abilene, with which was inclosed a copy of a circular letter, dated May 8, 1924, from the Central State Bank of Abilene, addressed to the stockholders, in

which it was stated that the First State Bank had been forced by the banking department to liquidate, and the Central State Bank had taken over all its assets and assumed all its liabilities; that this action was due to having to charge off $253,334.99 assets, which absorbed the surplus, some $32,000 loss on account of the guaranty fund, and some $50,000 in frozen assets in the form of cattle loans, the letter continuing: "We had other items that the Commissioner thought were losses that practically consumed all of the capital stock, hence there were two procedures; one to assess the old stockholders, one hundred cents on the dollar, and the other to organize a new bank. * * * We have therefore organized a new bank; paid in $100,000.00 new money and charged out the doubtful paper. We are now giving to each stockholder twenty days within which to take out as much stock in the new institution as he has in the old, or any part thereof."

The record shows that the First State Bank was officially closed by the banking commissioner on May 5, 1924; that its assets were sold to the Central State Bank of Abilene on that date, in consideration of the assumption by it of all liabilities of the First State Bank, and this sale was confirmed on May 5, 1924, by decree of the district court. Plaintiff testified that Embry represented to him that he was vice president of the First State Bank, and knew its condition, and that one Bean introduced Embry to him as such vice president. Both plaintiff and his wife testified that Embry represented that the stock was worth full par value or more. The cashier of the Central Bank, who was also cashier of the First State Bank up to its dissolution, testified that Embry was vice president of the latter from December 1, 1923, to April 1, 1924; and that the financial condition of the First State Bank during the 30 days and the twelve months prior to "its reorganization into the Central State Bank" was the same as at the time it was closed.

On July 21, 1924, plaintiff sued defendant in the district court for $400, alleging failure of consideration to that extent in the contract of sale, and sought to establish and foreclose an equitable lien upon the property conveyed to defendant. October 18, 1927, this suit was dismissed for want of jurisdiction, the court sustaining a plea to that effect. This plea is not in the record, but we assume that it was based upon alleged insufficiency of plaintiff's allegations to support the claim of lien, thus leaving the amount in controversy below the jurisdiction of the district court.

While a number of propositions are asserted by both parties, those controlling the decision may be reduced to two urged by appellant: (1) That the district court suit was res adjudicata; (2) that defendant was released from liability for breach of contract to have the stock transferred in the name of plaintiff because of the subsequent impossibility of performance arising from the destruction of the subject-matter.

■ The first contention is overruled. The record shows that the district court case was not decided upon its merits, but was merely dismissed for want of jurisdiction; and therefore it was not a bar to a subsequent suit in the proper forum for damages arising from breach of contract.

The question of the effect of impossibility of performance of a contractual obligation as affording a defense to an action for failure to perform has been a prolific source of judicial decision and legal literature. Our discussion will be limited to the particular aspects of the question which seem to us to bear directly upon the case at bar.

■ Where the impossibility exists at the time the contract is made, and is known to defendant and unknown to plaintiff, the former will not be permitted to urge such impossibility as a defense. South Texas Lumber Co. v. Wolvin (Tex. Civ. App.) 199 S. W. 1129; 13 C. J. p. 639, § 711.

■ Where the impossibility arises after the contract is made and the defendant had knowledge of facts and circumstances from which it might reasonably have been foreseen, but makes no provision for such contingency, he assumes the risk of the happening of the impossibility, and cannot defend on that ground. Northern P. R. Co. v. American Trading Co., 195 U. S. 439, 25 S. Ct. 84, 49 L. Ed. 269.

The same rule should apply where the impossibility exists when the contract was made.

"The fact that the impossibility might have been foreseen readily, and that no provision is made against it, is regarded as sufficient to show that the party who made an unconditional and unqualified promise intended to assume the risk of the happening or event in question." 5 Page on Contracts, p. 4715.

■ The undisputed facts here show a condition of the bank's affairs extending back for a period of a year, rendering precarious its continued existence. Defendant had been vice president up to a month before the contract was made. He represented that he was still vice president, that he knew the condition of the bank, and that it was solvent and its stock worth at least par. Plaintiff knew nothing of those matters. The bank was closed the following business day after the contract was made, and the conclusion is irresistible that the bank was then in imminent danger of being closed, if in fact arrangements for its closing had not already been made. Whether defendant actually knew of such condition we think unimportant. He did know the facts which brought about that condition, and represented that he was vice president of the bank and had actual knowledge of its affairs. He obtained from plaintiff and his wife the title and possession of their property upon these representations and

the express contractual stipulation that he would get the stock "transferred into the name of H. H. Lewis." This stipulation was absolute and unconditional. He has continuously held the property and refused to make any restitution for the unsatisfied part of the consideration.

In an action to recover for partial failure of consideration of a contract where the defense was subsequent impossibility of performance, the Kentucky Court of Appeals said: "Appellant having received pay to perform this service for appellee and having failed to perform it because of an accident for which neither is to blame, ought not to want to retain the thing of value for which he had done nothing, and the law will not permit him to do so." Jones-Gray Const. Co. v. Stephens, 167 Ky. 765, 181 S. W. 659.

And so here with equal appeal to natural justice and fair dealing can it be said that defendant ought not to want to deny his absolute obligation to transfer the stock to Lewis, without making restitution pro tanto for what he had received for that obligation, and the law ought not to permit him to do so.

We do not, however, rest our decision upon the ground of estoppel. It seems clear to us that under the circumstances above detailed, which are without dispute in the record, the defendant should be held to have assumed the risk of inability to comply with his contract; that his obligation was absolute and not impliedly conditioned upon the continued existence of the bank.

The trial court's judgment is affirmed.

Affirmed.